## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 30 2017, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Paula M. Sauer
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Keith D. Williams,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

November 30, 2017

Court of Appeals Case No.
32A01-1707-CR-1589

Appeal from the
Hendricks Superior Court

The Honorable
Mark A. Smith, Judge

Trial Court Cause No.
32D04-1602-F6-110

**Kirsch, Judge.**

[1] Following a bench trial, Keith D. Williams ("Williams") was found guilty but mentally ill of committing Level 6 felony intimidation[1] and Class B misdemeanor battery.[2] He appeals his intimidation conviction, asserting that the evidence was insufficient to convict him because the State failed to prove the "prior lawful act" element of the intimidation statute.

[2] We affirm.

## Facts and Procedural History

[3] Williams has a documented history of mental illness. He has been on disability since 2011, has been diagnosed with paranoid schizophrenia, and was hospitalized psychiatrically on two occasions, one in 2010 and another in 2013. On February 4, 2016, Williams walked into Abacus Staffing ("Abacus"), a staffing or employment agency. Mellissa Fender ("Fender") was working by herself, and she greeted Williams as he entered. Williams expressed interest in obtaining employment, and Fender handed him a job application on a clipboard, and then she went down the hall to a copy room to make copies of orientation packets, telling Williams to let her know if he had any questions as he filled out his application.

[4] While Fender was in the room making copies, the office phone rang, and she walked across the hall to her office and answered it. The call was from a female

---

[1] *See* Ind. Code § 35-45-2-1(a)(2).

[2] *See* Ind. Code § 35-42-2-1(b)(1).

who had completed an application a few days prior and was checking on the status of her application. To confirm that she was looking at the correct application, Fender repeated the applicant's last name back to her, "Spivey," and told her that Abacus was awaiting paperwork on her background check, but would call her when it had an open position for her. *Tr. Vol. II* at 50. Fender concluded the call and hung up. As she did so, Fender heard movement in the front office, similar to the movement of a chair, so she returned to the front office to see if Williams was done with the application or had questions.

[5] When she walked in, Williams was standing between her and the front door with his application rolled up in one hand and the clipboard in the other. His demeanor had changed, and he looked angry, rigid, and was "very, very, very upset." *Id*. at 52. Williams yelled at Fender and told her that "he had heard [her] on the phone disrespecting him" by calling him a "he she." *Id*. He continued yelling and saying "that people like [her] were always disrespecting him." *Id*. Fender told Williams that he must have misunderstood her, that she did not call him a "he she," and "actually told [Williams] the last name that I was saying" on the phone. *Id*. Williams continued to yell at Fender, and he pointed at her and said how "white bitches" like her were always disrespecting him. *Id*. at 53, 56. He then flung the clipboard at Fender, hitting her in her upper leg. He also threatened to slit her throat and said that he wanted to shove the clipboard up her "bloody ass pussy." *Id*. at 54. Fender felt "very scared." *Id*. Williams stepped out the front door twice, but immediately re-entered, each time calling Fender names and yelling about how she and others disrespected

him. He also warned Fender that if she drove past East Main Street that he would "make sure [she] got what was coming to [her]." *Id.* at 56. Williams left the premises again, and Fender saw him through the glass door as he walked away toward where Fender's car was parked, so she locked the door behind him. She retrieved a pistol from her office, called her boss, and called her husband. Fender's boss called the police, but Williams left moments before the police arrived. A few days later, Williams called Abacus and spoke to Fender's boss, making reference in the call to his recent encounter with Fender and indicating that he understood what he had said to her was not appropriate. Williams apologized for what he had said to Fender.

[6]     In February 2016, the State charged Williams with Level 6 felony intimidation and, later, with Class B misdemeanor battery. Williams filed a Notice of Defense of Mental Disease or Defect and Motion for Examinations. The trial court appointed two psychologists, Dr. Don Olive ("Dr. Olive") and Dr. George Parker ("Dr. Parker") to conduct competency evaluations, and the next day, the trial court ordered the same two doctors to conduct examinations as to his sanity at the time of the offense. Following a July 2016 hearing, Williams was found not competent to stand trial and was committed to the custody of Division of Mental Health and Addiction for competency restoration services.

[7]     In January 2017, Williams was returned to Hendricks County to stand trial. Dr. Olive had concerns about Williams's limited intellectual resources, but he did not believe that there was clear evidence of a mental disease or defect that rendered Williams unable to appreciate the wrongfulness of his conduct, and he

opined that Williams was not insane at the time of the offense. *Tr. Vol. II* at 106-107, 112; *State's Ex.* 1. Dr. Parker believed that Williams met the criteria for a schizophrenia diagnosis, such that he had a mental disease or defect, but that Williams had a basic appreciation of the wrongfulness of his actions. *Tr. Vol. II* at 118; *State's Ex.* 2. Both court-appointed psychologists believed that Williams was not insane at the time of the offense.

[8] Williams waived his right to a jury trial, and a two-day bench trial was held on March 14, and June 23, 2017. The State presented the testimony of Fender and of her boss. Fender testified to the above course of events, that being she was alone in the office, Williams walked in, she gave him an application and went to the back to make copies, and while back there, she answered the phone and spoke to a female applicant who had been at Abacus a few days prior. Fender repeated the woman's last name and told her that Abacus would get back with her when it had a job for her. Fender returned to the front area and encountered an angry Williams who said that he heard her on the phone calling him a "he she." *Tr. Vol. II* at 52. Fender testified that she was alone in the office with Williams, who stood between her and the front door, and that she was scared. He threw the clipboard at her and made derogatory remarks to her. Eventually, he left, and she locked the door and called her boss and her husband.

[9] Williams testified in his defense. He presented a different version of events, stating that he went to Abacus, where Fender gave him an application to complete. He stated that, as he was filling out the application, another man

walked in the door, and Fender spoke to him about an orientation. According to Williams, Fender pointed at Williams and told the other man that "this girl also fillin a uh, is [] going to a orientation," and Williams told Fender, "I'm not no she, that I'm a uh, man." *Id*. at 72. Williams testified that, at some point, the phone rang and that Fender answered it at the front desk, where he could see her, but could not hear her. Williams testified that, while seated, he told Fender that he did not want to be disrespected, then stood, threw the clipboard to the floor, and left after Fender "disrespected" him. *Id*. at 75. He estimated that the other man who he said had entered the office was there for less than a minute. Williams denied making any threats or derogatory comments to Fender and said that "[e]verything" Fender had testified to "was completely a lie." *Id*. at 89.

[10] The trial court rejected Williams's insanity defense, but found him guilty but mentally ill on both counts. He was sentenced to 600 days in the Hendricks County Jail on the intimidation conviction and 180 days on the battery conviction. The sentences were reduced for credit time and ordered to run concurrently. Williams now appeals.

## Discussion and Decision

[11] On appeal, Williams claims that his intimidation conviction should be reversed because the State failed to prove the "prior lawful act" element of Indiana Code section 35-45-2-1. In reviewing a claim of insufficient evidence, this Court does not reweigh the evidence or assess witness credibility. *Huber v. State,* 805

N.E.2d 887, 890 (Ind. Ct. App. 2004). It considers only the evidence most favorable to the verdict, together with all reasonable and logical inferences to be drawn therefrom. *Id.* We affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Leggs v. State*, 966 N.E.2d 204, 208 (Ind. Ct. App. 2012).

[12] To convict a defendant of Level 6 felony intimidation, the State must prove that (1) the defendant communicated a threat (2) to another person (3) to commit a forcible felony (4) with the intent that the other person be placed in fear of retaliation (5) for a prior lawful act. Ind. Code § 35-45-2-1(a)(2), (b)(1)(A). Here, the charging information alleged as follows:

> On or about 02/04/16, in Hendricks County, Indiana, Keith Dewayne Williams did communicate a threat to Melissa (sic) Fender with the intent that the other person:
>
> be placed in fear of retaliation for a prior lawful act, to-wit: for making a statement on the phone to someone that Mr. Williams believed was in reference to him.
>
> Furthermore,
>
> The threat was to commit a forcible felony.

*Appellant's App. Vol. II* at 13. On appeal, Williams challenges the sufficiency of the State's evidence only as to the "a prior lawful act" element, posing the following query: "[C]an a person be convicted for threatening to retaliate for an act that never happened?" *Appellant's Br.* at 11. His position is that the alleged

lawful act was Fender calling Williams a "he she," which she did not do, and thus "the State hinges its case on an act [that] did not take place[,]" and because he "cannot be prosecuted for making threats for something that never happened[,]" the State cannot satisfy the "prior lawful act" element. *Id*. at 9-10, 13. We disagree with the premise that a prior lawful act never happened.

[13] The evidence most favorable to the conviction is that Fender was in the Abacus office, alone, when Williams entered and that she remained alone with him the entire time. As part of her job duties, she answered the phone when it rang, taking the call in her office, which was located down the hall from the front office area, where Williams sat and worked on his application. When she returned to check on him, he was standing and appeared "enraged." *Tr. Vol. II* at 52. According to Fender, "[H]e began telling me that . . . he heard me on the phone disrespecting him, that I was calling him a he she, that people like me are always disrespecting him." *Id.* The evidence, then, was that Williams's anger was specifically about what she said, or he thought she said, on the phone call. That is, the prior lawful act was her answering the phone call and speaking to the applicant. Although Williams was mistaken about Fender's words, he threatened to attack her in retaliation for the words that he believed she said on the phone. We agree with the State that "the prior lawful act was not that Fender made derogatory statements about [Williams], . . . but the fact that she was engaged in her job and speaking to an applicant on the phone, and

[Williams] assumed that she was speaking about him."[3]  *Appellee's Br.* at 11.
Accordingly, we find that the State presented sufficient evidence to convict
Williams as charged of Level 6 felony intimidation.

[14]   Affirmed.

[15]   Najam, J., and Brown, J., concur.

---

[3] In arguing that he "cannot be prosecuted for making threats for something that never happened," *Appellant's Br.* at 13, Williams asserts that "[h]e responded to a delusion, not an act." *Appellant's Reply Br.* at 6.  To the extent that the "delusion" he is referring to is the alleged man that entered the office for a minute and to whom Fender supposedly spoke, that was a completely different version of events than that which Fender described.  She testified that she and Williams were at all times alone in the office and that Williams was angry at her based on what he heard during her phone call, whereas Williams testified that he was mad at her for calling him a "girl" to the other man. *Tr. Vol. II* at 72.  The trial court saw the witnesses, judged their credibility, and chose to believe Fender's version, as was the trial court's prerogative. *Loyd v. State*, 787 N.E.2d 953, 959 (Ind. Ct. App. 2003).  We thus reject any suggestion that the prior lawful act had anything to do with what may have been a delusion of another man's presence in the office and Fender's purported remarks to him.